UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Francis M. Reynolds

v. Civil No. 16-cv-384-JL
Opinion No. 2016 DNH 214

InVivo Therapeutics Holdings Corp., et al.

**MEMORANDUM ORDER**

This defamation action turns on whether this court has specific personal jurisdiction over several Massachusetts citizens and a Nevada corporation that has its principal place of business in Massachusetts. Plaintiff Francis Reynolds, a New Hampshire businessman, brings claims of defamation, conspiracy, and tortious interference with prospective contractual relations against his former corporation, InVivo Therapeutics Corp., and several of its officers. This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) (diversity).

Moving to dismiss this action, the defendants challenge this court's personal jurisdiction over them. See Fed. R. Civ. P. 12(b)(2). They also move to dismiss for failure to state a claim for relief. See Fed. R. Civ. P. 12(b)(6). After holding oral argument, the court grants the defendants' motion. The plaintiff has failed to establish that defendants have the minimum contacts with New Hampshire required for this court to

exercise personal jurisdiction over them in this action consistent with the Fourteenth Amendment's Due Process Clause. Specifically, the plaintiff has not demonstrated relatedness between his claims and the defendants' forum-based activities or that the defendants engaged in purposeful contact with the forum such that they could expect to be haled into court to answer for their actions here.

## I. Applicable legal standard

"Personal jurisdiction implicates the power of a court over a defendant . . . . [B]oth its source and its outer limits are defined exclusively by the Constitution," namely, the due process clause of the Fourteenth Amendment. Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 143-44 (1st Cir. 1995) (citing Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)); U.S. Const. Am. XIV. "To establish personal jurisdiction in a diversity case, a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment." C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014). Where, as here, the applicable long-arm statute is coextensive with federal due process limitations, the court proceeds directly to the due process inquiry. See Phillips

Exeter Acad. v. Howard Phillips Fund, 196 F.3d 284, 287 (1st Cir. 1999).

Due process requires that a defendant have sufficient "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). Consistent with those requirements, a court may exercise either general or specific jurisdiction over the defendants. Reynolds invokes only this court's specific jurisdiction over the defendants.[1] Specific jurisdiction "is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." Goodyear, 131 S. Ct. at 2851 (internal quotations omitted). "[T]he constitutional test for determining specific jurisdiction . . . has three distinct components, namely, relatedness, purposeful availment (sometimes

[1] Appropriately so. The criteria for general jurisdiction over the defendants are not satisfied here. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011). A corporation is "fairly regarded at home" for general jurisdiction purposes in its "place of incorporation and principal place of business." Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014). The defendants -- three Massachusetts residents and a Nevada corporation headquartered in the Commonwealth -- have no such ties to New Hampshire.

called 'minimum contacts'), and reasonableness." Adelson v. Hananel, 652 F.3d 75, 80-81 (1st Cir. 2011) (internal quotations and citations omitted).

The plaintiff bears the burden of demonstrating that these three components are satisfied by "proffer[ing] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction."[2] A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016) (quoting Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008)). "To satisfy the prima facie standard in a specific jurisdiction case, a plaintiff may not rest on mere allegations but, rather, must submit competent evidence showing sufficient dispute-related contacts between the defendant and the forum." Carreras v. PMG Collins, LLC, 660 F.3d 549, 552 (1st Cir. 2011). The court "view[s] this evidence, together with any evidence proffered by the defendant[s], in the light most favorable to

[2] The First Circuit Court of Appeals has recognized three standards under which a district court may evaluate personal jurisdiction. See A Corp., 812 F.3d at 58 & n.5. Where, as here, the parties agree that the prima facie standard is appropriate and the defendants have not requested an evidentiary hearing, the court may -- and does -- require the plaintiff only to make a prima facie showing that defendants are subject to personal jurisdiction. This is "the least taxing of these standards from a plaintiff's standpoint, and the one most commonly employed in the early stages of litigation." Id. (quoting Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83-84 (1st Cir.1997)).

the plaintiff and draw[s] all reasonable inferences therefrom in the plaintiff's favor," albeit without "credit[ing] bald allegations or unsupported conclusions." Id. The following factual summary takes this approach.

## II. Background

Reynolds founded InVivo, a medical device company, in November 2005. He served as the company's CEO, CFO, CSO, President, and Chairman of the Board of Directors from that time until August 22, 2013.[3] Though InVivo established its headquarters in Cambridge, Massachusetts, in 2012, Reynolds largely worked out of his home in Salem, New Hampshire, between October 2012 and his departure from the company in August 2013. That August, Reynolds resigned from his position as Chairman, CEO, and CFO of InVivo.[4]

One week after resigning from InVivo, Reynolds formed a new company, PixarBio, which focused on developing non-opioid pain relief products. PixarBio operated out of Reynolds' Salem home

[3] Reynolds Aff't (doc. no. 9-2) ¶¶ 4-5.

[4] Reynolds contends that he did not voluntarily resign, but was forced to do so after "the Defendants made false allegations that [he] misappropriated corporate funds" -- a charge that he denies. Id. ¶ 16.

until it moved to Medford, Massachusetts, in early 2014.[5] In March 2016, it obtained additional office facilities in Salem.[6]

Following Reynolds' resignation from InVivo, Reynolds alleges, the defendants made several allegedly defamatory statements about his work at that company. First, the company issued two press releases. In one, dated August 22, 2013, InVivo announced that Reynolds had resigned from the company due to his medical condition.[7] The next press release, issued August 27, 2013, announced "an update on the clinical timeline for its biopolymer scaffolding to treat acute [spinal cord injuries]. The Company now expects that, based on the judgment of new management, it will enroll the first patient during the first quarter of 2014."[8] Following the press releases, Reynolds alleges that defendant Luque made certain statements to investors. Specifically, in September 2013, defendant Luque allegedly told an InVivo investor that Reynolds "had been forced to resign because the NeuroScaffold clinical studies were 'bogus' and their result had been 'fudged' by [Reynolds]," and that "Plaintiff misrepresented the timeline for InVivo to obtain

---

[5] Reynolds Aff't (doc. no. 9-2) ¶ 18; Reynolds Aff't Ex. E (doc. no. 9-7) at 1.

[6] Reynolds Aff't (doc. no. 9-2) ¶ 19.

[7] Reynolds Aff't, Ex. F (doc. no. 9-8) at 1.

[8] Reynolds Aff't, Ex. G (doc. no. 9-9) at 1.

regulatory approval for the NeuroScaffold."[9] Reynolds further alleges that Luque made similar statements during an August 2014 telephone conference with a second InVivo investor, to the effect that Reynolds had "misled people" about clinical trial results and "deliberately manipulated the release of test results to distort the beneficial effects of the NeuroScaffold."[10] These allegations, Reynolds contends, were then circulated in the biotechnology community via, among other media, "a crowd-sourced service for financial markets" called "Seeking Alpha."[11]

On July 22, 2016, Reynolds filed this action in Hillsborough County Superior Court, asserting claims for defamation, conspiracy, and tortious interference with prospective contractual relations against all defendants, and a claim based in the doctrine of respondeat superior against InVivo. Defendants subsequently removed the case to this court in light of the parties' diversity of citizenship. See 28 U.S.C. § 1332(c).

[9] Compl. (doc. no. 1-1) ¶ 29.

[10] Id. ¶ 30.

[11] Id. ¶ 33-37.

## III. Analysis

As discussed supra, "the constitutional test for determining specific jurisdiction . . . has three distinct components, namely, relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness." Adelson, 652 F.3d at 80–81 (internal quotations and citations omitted). The court addresses these components in that order, see United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 621 (1st Cir. 2001) (quoting Phillips Exeter Acad., 196 F.3d at 288), and concludes that the plaintiff has not established this court's personal jurisdiction over the defendants.[12]

### A. Relatedness

"To satisfy the relatedness prong, the plaintiff must show a nexus between [his] claims and the defendants' forum-based activities. Although this is a 'relaxed standard,' it nevertheless requires [the court] to hone in 'on the relationship between the defendant and the forum.'" A Corp., 812 F.3d 54, 59 (1st Cir. 2016). "[A] defendant need not be physically present in the forum state" for such a nexus to

[12] The defendants also argue that the complaint fails to state a claim for relief. See Fed. R. Civ. P. 12(b)(6). Because the court concludes that it lacks personal jurisdiction over the defendants and dismisses this action on that basis, it need not -- and therefore does not -- address the defendants' Rule 12(b)(6) arguments.

exist, N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005) (citing Calder, 465 U.S. at 789), and when he is not, the court "looks for some other indication that the defendant reached into the forum, such as mail or telephone contacts," Swiss Am. Bank, 274 F.3d at 622.

In arguing that a nexus exists between the defendants' activities and the forum, the plaintiff invokes only his allegations that he was injured in New Hampshire by the effects of the defendants' conduct.[13] It is, however, the defendants, and not the plaintiff or any third parties, who must create the contacts with the forum state. Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014) (minimum contacts analysis "looks to defendant's contacts with forum State itself, not the defendant's contacts with persons who reside there"). That the plaintiff felt the effects of the defendants' activities in the forum does not, alone, qualify as related contacts. Swiss Am. Bank, 274 F.3d at 622-23.

In fact, the First Circuit Court of Appeals has specifically cautioned against conflating the relatedness requirement with the effects test for purposeful availment,

---

[13] Obj. to Mot. to Dismiss (doc. no. 9-1) at 12-13 ("Plaintiff has alleged facts demonstrating that Plaintiff suffered reputational injury in New Hampshire as a result of Defendants' defamatory statements. These allegations satisfy the relatedness requirement.")

discussed infra Part III.B, which is what the plaintiff invites the court to do here. Swiss Am. Bank, 274 F.3d at 622-25. The court must, accordingly, decline that invitation. None of the other cases relied upon by the plaintiffs convince it to do otherwise. In each of those cases, the defendant acted within the forum; the plaintiff's injuries did not constitute the sole relationship between the forum and the defendants. See R & R Auction Co., LLC v. Johnson, 2016 DNH 40, 20-21 (Barbadoro, J.) (plaintiff met relatedness requirement because defendant made allegedly false statements to "someone he knew to be a New Hampshire-based reporter"); New Eng. Coll. v. Drew Univ., 2009 DNH 158, 14 (Laplante, J.) (defendant university's agent acted within New Hampshire to interfere with plaintiff's business relations); Sindi v. El-Moslimany, No. 13-cv-10798-IT, 2014 WL 6893537, at *8 (D. Mass. Dec. 5, 2014), 2014 WL 6893537, at *8 (finding relatedness where defendant "came to Needham, Massachusetts and . . . allegedly followed [the plaintiff] around" and defendant's conduct "affected [plaintiff's] relationship with Massachusetts organizations").

**B. Purposeful availment**

Even had the plaintiff satisfied the relatedness requirement, the court would still be unable to exercise specific personal jurisdiction over the defendants because the

plaintiff has not shown purposeful availment. The Supreme Court has adopted, and the First Circuit Court of Appeals has employed, "an effects test for determining purposeful availment in the context of defamation cases." Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998) (citing Calder v. Jones, 465 U.S. 783, 789 (1984)). This test, unlike that for relatedness, focuses on the location at which the effects of the alleged defamation are directed and where they are felt. Id. It is ordinarily "to be applied only after the relatedness prong has already been satisfied." Swiss Am. Bank, 274 F.3d at 623.

In Calder, two Florida reporters for the National Enquirer wrote a libelous article about a California entertainer. The Supreme Court found that the California court could exercise jurisdiction over the reporters because they "had aimed an act at the forum state, knew the act would likely have a devastating effect, and knew the injury would be felt in the forum state, where Jones lived and worked 'and in which the National Enquirer [had] its largest circulation.'" Noonan, 135 F.3d at 90 (quoting Calder, 465 U.S. at 790). "The knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions." Hugel v. McNell, 886 F.2d 1, 4 (1st Cir. 1989), cert. denied,

494 U.S. 1079 (1990). "The crux of Calder was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." Walden, 134 S. Ct. at 1123-24.

Applying this test in Noonan, the First Circuit Court of Appeals found that the District Court for the District of Massachusetts could not exercise personal jurisdiction over a French advertising agency because the agency "did not direct [its] actions toward Massachusetts" when its advertisement was aimed at the French consumer market. Noonan, 135 F.3d at 90-91. The fact that some magazines containing the advertisement circulated in Massachusetts did not satisfy this element; their small number indicated, instead, a lack of purposeful contact. Id. at 91. The plaintiff's lack of injury in Massachusetts also supported a finding that he failed to satisfy this element. Id. at 91-92.

Looking at this case under the lens of Calder and Noonan, it resembles the latter more than the former. It does not appear to the court that the defendants purposefully directed the allegedly injurious statements at New Hampshire or that Reynolds suffered any injury in New Hampshire.

The plaintiff alleges that the defendants injured him, and his new company, by circulating a series of "false and defamatory statements . . . to discredit [him] in the

biotechnology community and financial marketplace."[14] These include:

- unspecified statements concerning alleged misappropriation of funds by Reynolds that the defendants made within InVivo, including to company employees[15];
- a September 2013 conversation between defendant Luque and an investor, in which Luque allegedly informed the investor that the plaintiff had "fudged" the results of the NeuroScaffold clinical studies, that the studies were "bogus," and that the plaintiff had misrepresented the timeline to obtain regulatory approval[16];
- an August 5, 2014 telephone conference between defendant Luque and a second investor, in which Luque allegedly made the same or similar representations,

[14] Compl. (doc. no. 1-1) ¶ 26.

[15] Compl. (doc. no. 1-1) ¶ 28; Reynolds Aff't (doc. no. 9-2) ¶ 16.

[16] Compl. (doc. no. 1-1) ¶ 29; Reynolds Aff't (doc. no. 9-2) ¶ 28.

including that Reynolds had "misled people" about the results of the clinical trials[17];

- statements made by defendants DiPietro, Roberts, and/or McCarthy at a September 2013 meeting of the company's employees announcing the plaintiff's resignation[18]; and
- allegedly defamatory press releases concerning projected timeline for obtaining FDA approval.[19]

These statements can be grouped into three categories: those made internally to InVivo employees, those made to investors, and those published by InVivo. The court concludes that the defendants did not aim any of these statements at New Hampshire.

The first category of statements includes those made to InVivo employees. InVivo maintains its principal place of business is Cambridge, Massachusetts, and for a time during Reynolds's employment, maintained an office in Salem, New

[17] Compl. (doc. no. 1-1) ¶ 30; Reynolds Aff't (doc. no. 9-2) ¶ 29.

[18] Compl. (doc. no. 1-1) ¶ 31. Reynolds does not address these alleged statements in his affidavit.

[19] Compl. (doc. no. 1-1) ¶ 32; Reynolds Aff't (doc. no. 9-2) ¶¶ 20-22. Though not accompanying the complaint, copies of the purportedly offending press releases are attached to the defendants' motion to dismiss and the plaintiff's objection thereto. See Defendants' Exs. A, B (doc. nos. 2-7, 2-8); Reynolds Aff't Exs. F, G (doc. nos. 9-8, 9-9).

Hampshire.[20] There is no allegation or evidence that any employee besides Reynolds himself worked out of InVivo's Salem, New Hampshire office. There is therefore no indication that any of the defendants directed the statements made to InVivo employees toward New Hampshire.

The second category of statements contains those made by Luque to investors. The plaintiff does not indicate the location of those investors. Plaintiff does allege that these statements were disseminated "throughout the biotechnology community and among investors" via an August 23, 2013 article in "Seeking Alpha," a "crowd-sourced service for financial markets."[21] While the plaintiff "believe[s] the Defendants were the source of these allegations,"[22] the plaintiff has offered no

---

[20] Id. ¶¶ 8. InVivo disputes whether Reynolds's home office constituted an InVivo office in New Hampshire. The evidence favors Reynolds's interpretation. InVivo informed him that his "principal place of work [was] at [his] office in Salem New Hampshire." Reynolds Aff't Ex. A (doc. no. 9-3). InVivo also furnished and equipped that office and, after Reynolds left InVivo, the company offered to sell that equipment to Reynolds. Reynolds Aff't Ex. D (doc. no. 9-6). Reynolds also avers that InVivo's primary data center for research and development was installed in his New Hampshire office. Reynolds Aff't (doc. no. 9-2) ¶ 9. This evidence, taken in the light most favorable to Reynolds, see Carreras, 660 F.3d at 552, suggests that InVivo considered Reynolds' New Hampshire office as its own during the term of his employment.

[21] Id. ¶¶ 34-36. The parties have also submitted a copy of this article. See Defendants' Ex. C (doc. no. 2-9); Plaintiff's Ex. K (doc. no. 9-13).

[22] Id. ¶ 32.

evidence beyond his subjective belief that would connect the defendants to Seeking Alpha or the author of the offending posts, "Biotech Sage." Nor does the plaintiff suggest that Seeking Alpha is a publication or service that directs information specifically at New Hampshire in any manner. Accordingly, there is no indication that the defendants directed these statements toward New Hampshire, either.

The allegedly defamatory press releases comprise the final category. As with the others, there is no indication that the defendants directed the statements at New Hampshire. The releases indicate they were made in Massachusetts and appear to have been posted on the company's website.[23] Statements posted to the internet at large, even if read by non-plaintiff residents of the forum state, do not appear to this court to have been specifically directed at the forum absent some indication that they were directed at those residents. See A. Corp., 812 F.3d at 60-61 (use of passive website "accessible from everywhere in the world," absent any specific direction to the forum, "is not enough to show purposeful availment."); cf. Abiomed, Inc. v. Turnbull, 379 F. Supp. 2d 90, 94 (D. Mass. 2005) (purposeful availment when defendant specifically directed internet postings to known Massachusetts residents).

[23] Reynolds Aff't Exs. F, G (doc. nos. 9-8, 9-9).

Even had the defendants aimed these statements at New Hampshire, taking the evidence in the light most favorable to the plaintiff, Reynolds has not established that the effects of defendants' conduct were felt in New Hampshire. See Noonan, 135 F.3d at 90-91. The plaintiff raises as his damage the fact that potential investors have declined to fund his new company, PixarBio, "due to allegations concerning mismanagement and misconduct while [he] was at InVivo."[24] He cites two specific failures to obtain funding. First, he attempted to obtain funding through the New Hampshire Department of Resources and Economic Development, but did not succeed. Reynolds avers that he "believe[s]" that "[t]hese efforts have been unsuccessful due in part . . . to the reputational harm [he] suffered as a result of Defendants' defamatory statements,"[25] but he offers no evidence beyond his subjective belief. As a second instance of failed funding, he outlines his inability to obtain a second round of funding from the Massachusetts Center for Life Sciences, which specifically "commented on [his] reputation for aggressive fundraising."[26] Reynolds asserts that this was a reference to the defendants' allegations that he "misled

---

[24] Reynolds Aff't (doc. no. 9-2) ¶ 24.

[25] Id. ¶ 25.

[26] Id. ¶ 26.

investors by misstating the resulting [sic] of clinical trials and the FDA timeline for the NeuroScaffold."[27] Taking these allegations as true, these allegations support a conclusion that Reynolds suffered reputational damage in Massachusetts, but not that he did so in New Hampshire.

### C. Reasonableness

In assessing reasonableness, the court takes into account the following considerations:

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

A Corp., 812 F.3d at 61 (quoting Downer, 771 F.3d at 69). Where the plaintiff fails to satisfy the first two elements of the due process inquiry -- relatedness and purposeful availment -- the court "need not dwell on these so-called 'gestalt' factors." Id.; see also Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 210 (1st Cir. 1994) ("[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and

[27] Id.

purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction.”).

While the defendants’ burden of appearing in New Hampshire may not be overly heavy, all parties have standing connections to Massachusetts -- the defendants are Massachusetts citizens, InVivo is headquartered in Massachusetts, and the plaintiff’s new corporation, PixarBio, is also located in Massachusetts. The parties are already engaged in a lawsuit in Massachusetts,[28] which arose out of the same business relationship. As the parties conceded at oral argument, the claims asserted in the Massachusetts action, to a certain extent, overlap the claims raised in this action; and the defendants’ counsel would not object to late joinder of these claims as counterclaims in the Commonwealth. In light of these connections to Massachusetts, and the dearth of connections to New Hampshire beyond the plaintiff’s residency in this State, these factors weigh against finding personal jurisdiction in this court.

## IV. **Conclusion**

Because the plaintiff has failed to demonstrate that this court may exercise personal jurisdiction over the defendants,

---

[28] Compl. (doc. no. 1-1) ¶ 28 n.2; Reynolds Aff’t (doc. no. 9-2) ¶ 11.

the defendants' motion to dismiss the complaint[29] is GRANTED, albeit without prejudice to plaintiff asserting his claims in another forum.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated: November 30, 2016

cc: Christopher H.M. Carter, Esq.
Gary R. Greenberg, Esq.
Cliff Anderson, Esq.

[29] Doc. no. 2.